1

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

-     -     -

COMMONWEALTH OF                )
                               )
PENNSYLVANIA                   )
                               )
       vs.                     )     No. 1178-2019
                               )
JAMES CARLO                    )
QUISENBERRY,                   )
                               )
            DEFENDANT          )
                               )

-     -     -

MOTION TO REVOKE BOND
IN THE ABOVE-ENTITLED CAUSE
BEFORE THE HONORABLE
GERALD R. SOLOMON, SENIOR JUDGE,
HELD ON AUGUST 15, 2019,
IN COURTROOM NO. 5

APPEARANCES:

Evan A. Lowry, II, Esquire,
Deputy Attorney General
Representing the Commonwealth

Shane M. Gannon,  Esquire
Representing the Defendant


TRANSCRIPT OF PROCEEDINGS


                          Transcribed by:

                          Sara Necciai
                          Court Reporter

Transcript filed in the
Office of the Clerk of Courts
this 28th  day of August, 2019



2

I N D E X

Witness:  Jon Ridge

    Direct Examination by Mr. Lowry        4

    Cross-Examination by Mr. Gannon      10

    Redirect Examination by Mr. Lowry    21

Witness:  James Carlo Quisenberry

    Direct Examination by Mr. Gannon     23

    Cross-Examination by Mr. Lowry      28

3

E X H I B I T S

| Commonwealth | Marked | Admitted |
|---|---|---|
| A - Maps | 22 | 22 |

| Defendant | Marked | Admitted |
|---|---|---|
| A - Google Maps Printout | 14 | 16 |

4

1                            P R O C E E D I N G S

2              THE COURT:  This is the time set with regard to

3     the Commonwealth's Motion to Revoke Bond in the matter of the

4     Commonwealth of Pennsylvania versus James C. Quisenberry at

5     No. MJ-27301-01-CR-50-219.

6                      Is the Commonwealth ready to proceed?

7              MR. LOWRY:  Yes, Your Honor.

8              THE COURT:  Is the defendant ready to proceed?

9              MR. GANNON:  Yes, Judge.

10             THE COURT:  You may proceed.

11             MR. LOWRY:  The Commonwealth will call Chief

12    Jon Ridge to the stand, Your Honor.

13                  (Jon Ridge, having been sworn, testified

14    as follows:)

15             MS. PUSTOVRH:  Please be seated and state your

16    full name for the record.

17             THE WITNESS:  Jon Ridge.  I'm the Chief Adult

18    Probation and Parole Officer in Washington County,

19    Pennsylvania.

20                         DIRECT EXAMINATION

21    BY MR. LOWRY:

22       Q.    Mr. Ridge, I'm going to call your attention to

23    August 10th of 2019.  Did you issue a warrant for the

24    defendant, James Quisenberry?

25       A.    I released a warrant for Mr. Quisenberry.  Yes.

5

1      Q.      And when you say you released a warrant, can you

2    tell me what you mean by that?

3      A.      Well, on all of our, what we call, tier three

4    defendants or offenders within our house arrest unit, we have

5    a presigned warrant, you know, for the purposes of safety,

6    really.

7      Q.      Okay.  And what's a tier three offender?

8      A.      Tier three is offenders that we've identified as,

9    you know, potentially dangerous in the community or all

10   domestic violence offenders.  Most of them are bond condition

11   -- or are bond individuals as opposed to adjudicated

12   individuals.  So we have to get a presigned warrant for the

13   bond or bail individuals because I don't have the ability to

14   detain as I would on an adjudicated case.

15     Q.      And in this case, did a Court of Common Pleas

16   Judge sign that warrant?

17     A.      They did.

18     Q.      And which judge signed that warrant?

19     A.      It was the President Judge, Judge Katherine B.

20   Emery.

21     Q.      And is the defendant in this case, James

22   Quisenberry, a tier three offender?

23     A.      He is because it's a domestic violence case.  Yes.

24     Q.      What occurred on August 10th that caused you to

25   release the warrant?

6

1      A.      Well, there was an exclusion zone breach.  You

2  know, there was contact in regards to --

3      Q.      I'm just going to stop you right there.  When you

4  say "there was an exclusion zone breach," can you describe

5  what an exclusion zone is?

6      A.      Well, the defendant in the case had gotten onto

7  the interchange at 279 Southpointe.

8      Q.      So what -- are exclusion zones areas where

9  defendants that have the Buddi Clip are not permitted to go?

10     A.      Yes.

11     Q.      And, in this case, the defendant entered one such

12 exclusion zone?

13     A.      He did.

14     Q.      Where was that exclusion zone?

15     A.      It was at the Southpointe 279 interchange -- or

16 I-79 interchange.

17     Q.      And why does that exclusion zone exist around that

18 area?

19     A.      Because the victim's home is within the two-mile

20 radius of that interchange.

21     Q.      Okay.  Now, I would assume that prior to -- or at

22 the time defendants are hooked up to the Buddi Clip, they are

23 informed of these exclusion zones?

24     A.      Yes.

25     Q.      And can you tell the Court if that happened with

7

1    the defendant in this case?

2        A.    Well, Mr. Quisenberry and I, when he initially

3    came on, we had a lengthy discussion about not being in

4    Southpointe.  He wanted to go to Southpointe pool.  I said,

5    "You can't go to Southpointe pool."  Anywhere in Southpointe

6    is going to be within the two-mile radius of the victim's

7    home.

8        Q.    You may not know this.  Do you know that the

9    defendant's bond was revoked and subsequently reinstated?

10       A.    I do.

11       Q.    Did the defendant have to come back to your office

12   to get rehooked up with the Buddi Clip?

13       A.    He did.

14       Q.    Were there any changes of the exclusion zones when

15   the defendant came back to your office to be --

16       A.    Well, there were some more exclusion zones added.

17       Q.    Okay.

18       A.    But we wouldn't tell the defendant that we added

19   the exclusion zones.

20       Q.    Okay.

21       A.    I mean, clearly, the Southpointe exclusion zone

22   has been in effect since the beginning.

23       Q.    Now, is there paperwork that the defendants fill

24   out when they sign up for the Buddi Clip?

25       A.    Yes.

1    Q.    And are defendants given an opportunity to write

2    any notes or anything in that paperwork?

3    A.    Well, they initial and sign and date.

4    Q.    Did the defendant write any additional information

5    on his Buddi Clip paperwork?

6    A.    He did.  He drafted that he refused to pay,

7    essentially.  I mean, I can read it to you specifically.  He

8    is not willing to pay for the Buddi Clip, and he did that on

9    both occasions, on the first hookup and the second hookup.

10    Q.    Now, are you able to determine how close the

11    defendant was to the victim's home on August 10, 2019?

12    A.    Pretty close.  He was within probably .04 miles,

13    as the crow flies.  I mean, you have to remember, that device

14    is, you know, a halo around a certain zone, and if you went

15    as the crow flies, I mean, it's very close.  Anywhere in

16    Southpointe, quite frankly, is going to be very close.

17    Q.    And do you personally know how quick an individual

18    can make up .4 miles?

19    A.    Yes.

20         MR. GANNON:  I would object to speculation,

21    Judge.  How would he know this?

22         THE WITNESS:  No, I actually didn't.

23         MR. GANNON:  Is it by car, by foot?

24         THE COURT:  Excuse me.  Excuse me.  Your

25    objection is what, Mr. Gannon?

9

1          MR. GANNON:   To speculation, Judge.   It's a

2    broad question.

3          MR. LOWRY:   Judge, I can lay a foundation.

4          THE COURT:   Lay a foundation, please.

5    Objection is sustained.

6    BY MR. LOWRY:

7      Q.     After finding out the closeness of the defendant

8    to the victim's home, did you attempt to determine how

9    quickly a person can walk .2 miles?

10     A.     Well, I actually did it previously.

11     Q.     Okay.

12     A.     But in testing our protocols and our processes for

13   the Buddi Clips, specifically in domestic violence cases, we

14   wanted to show how fast a person can be victimized in that

15   situation and how response times can be affected.   So I

16   actually walked a distance of a prior case that we had to

17   show that you can walk, you know, a distance of 0.2 miles in

18   roughly four minutes, and that's an average walk.

19     Q.     And is that something you also considered when

20   releasing the warrant for the defendant in this case?

21     A.     Yes.   I was concerned that another breach of that

22   exclusion zone would not afford enough time for a response.

23     Q.     Okay.   Did the -- is there any other reason that

24   you released the warrant on August 10th of 2019, for the

25   defendant?

10

1    A.     That was my main concern.

2    Q.     Okay.

3    A.     You know, there seemed to be -- there seems to be

4  some questions in regards to veracity in this case.  There

5  seems to be -- you know, there was a prior violation.  You

6  know, I took those things into consideration.

7    Q.     And when you say, "concern for veracity," what are

8  you referring to?

9    A.     Well, you know, when the defendant was asked about

10  how many firearms he had and he said one, and it ended up

11  being three.  You know, prior criminal history, there is a

12  prior criminal history.  But yet, the defendant said he

13  didn't have any.  I mean, those things affect how we take a

14  look at a case, and, you know, those things affect on what is

15  the real reason why a defendant may be exploring the

16  exclusion zone.

17             MR. LOWRY:  Your Honor, I would offer for

18  cross.

19                    CROSS-EXAMINATION

20  BY MR. GANNON:

21    Q.     Officer Ridge, you stated it was a presigned

22  warrant.  What do you mean by that?

23    A.     It's a presigned warrant.  The Judge presigns the

24  warrant.

25    Q.     So you have a stack of warrants that are signed by

11

1    a judge that aren't issued yet?

2         A.    No.  We have the authority to release them.

3         Q.    Okay.  So you make the decision whether to detain

4    someone for a violation of bail?

5         A.    In tier threes, yes.

6         Q.    It's all within your discretion, not within the

7    Judge's discretion?

8         A.    Yes.

9         Q.    The exclusion zone, tell me how you explained the

10   exclusion zone to Mr. Quisenberry.

11        A.    Well, I mean, it's a two-mile radius from the

12   victim's home.  When he and I had that discussion, we talked

13   about Southpointe in general because there was a dialogue

14   about him going to Southpointe pool.  I said, "You can't be

15   in Southpointe.  You can't go to the Southpointe pool."

16   Anywhere in Southpointe is going to be within the exclusion

17   point.

18        Q.    Two-mile radius, is that typical for all cases?

19        A.    For some.  Some, you know, it's really up to what

20   parameters we can set.  I mean, some bond cases, the victim

21   and the defendant happen to live in such close proximity that

22   they've agreed to that.  That wasn't the case in this one.

23        Q.    And, in this case, they do live in the same ZIP

24   code; correct?

25        A.    I don't know.  I don't know what ZIP codes are

12

1    exactly in both of them.

2         Q.    So you told Mr. Quisenberry it's a two-mile

3    radius?

4         A.    Uh-huh.

5                   THE COURT:  Please answer yes or no.

6                   THE WITNESS:  Yes, two-mile radius.

7                   THE COURT:  Thank you.

8    BY MR. GANNON:

9         Q.    Did you tell him, "It was as the crow flies"?

10        A.    I don't recall if I did or I did not.

11        Q.    Did you show him a map with a circle around it?

12        A.    Well, not a map.  But it's actually on the screen.

13   You could see the exclusion zone.  It's a big, red circle

14   that goes around.  Yeah.

15        Q.    Did you give him a copy of that?

16        A.    We don't give copies of that.

17        Q.    So if it's a two-mile radius, he can drive down

18   I-79, one of the busiest highways in Pennsylvania; correct?

19        A.    It would be very close.

20        Q.    You said he was .4 miles away, so almost a half a

21   mile?

22        A.    Roughly.

23        Q.    Where exactly was he located?

24        A.    Well, according to our graph, I mean, it looked as

25   if he got on right there at the I-79 interchange at

13

1    Southpointe.

2        Q.    It just looked like he got on the exit?

3        A.    Well, I mean, you could see -- you can follow his

4    GPS points, just like I'm sure you've seen before on any GPS.

5        Q.    Do you have that information available right now?

6        A.    I have a copy of it.  I mean, you really can't see

7    it very well.  But we can certainly make that happen if it

8    was necessary.

9            MR. GANNON:  Do you mind if I take a look at

10   it, Your Honor?  If I may approach?

11           THE COURT:  You may approach.

12           THE WITNESS:  There's three screenshots.  I

13   just -- I marked that one because that is it.  There is that

14   little square that's blocking it (indicating).  But, I mean,

15   if we pull it up on the history -- well, here's this.  You

16   can see this right here (indicating).  I can give you the

17   history of it so you can take a look.  That's just another

18   way of looking at the information.  It shows you all of the

19   locations.

20   BY MR. GANNON:

21       Q.    These are the violated locations?

22       A.    Exactly.

23       Q.    One violated location at Southpointe Boulevard?

24       A.    Yeah.

25       Q.    That would be the exit at Southpointe?

14

1     A.    Yeah.

2     Q.    Do you know if he was getting on the exit or

3 driving past it?

4     A.    It looked as if, after looking at the information

5 in this diagram -- that -- he was bearing onto this road.

6            THE COURT:  Excuse me.  Bearing onto which

7 road?

8            THE WITNESS:  I-79.  Probably Pittsburgh,

9 north, I guess.

10 BY MR. GANNON:

11     Q.    What is the distance from the exit Southpointe to

12 Judge Costanzo's home?

13     A.    Well, that was hard for me to determine, but

14 that's what I mean.  I estimated to be about 0.4 1miles, as

15 the crow flies.

16            MR. GANNON:  Your Honor, may I approach?

17            THE COURT:  You may approach.

18            (Whereupon, Defendant's Exhibit A was marked

19 for identification purposes.)

20 BY MR. GANNON:

21     Q.    I am going to show what I will mark for

22 identification purposes as Defendant's Exhibit A.  Take a

23 minute to look at that.  This is a Google maps printout, and

24 I won't say the address in open court.  But the top address,

25 is that the correct address of Judge Costanzo?

15

1     A.     I believe so.

2     Q.     And the bottom point is Southpointe Boulevard,

3  where the defendant was tracked?

4     A.     Yes.

5     Q.     What is the distance that Google maps set forth?

6     A.     It says 2.3 miles.

7     Q.     A lot farther than .4 miles?

8            MR. LOWRY:  Objection, Your Honor.  I believe

9  that's mischaracterizing the map in terms of what the most

10 direct route would be.

11           MR. GANNON:  Your Honor, it's relevant because

12 this is the distance road-wise from Ms. Costanzo's house to

13 the highway.  The officer testified that he wasn't sure if he

14 explained to Judge -- or Mr. Quisenberry that he told him it

15 was as the crow flies or road distances.  So how is he

16 supposed to know where the exclusion zone is?  It merely

17 shows that the distance is longer than two miles to get to

18 Southpointe Boulevard.

19           THE COURT:  By the roadway, rather --

20           MR. GANNON:  By roadway, Judge.

21           THE COURT:  Are you conceding it's within two

22 miles?

23           MR. GANNON:  No, it's not within two miles,

24 Judge.  It's 2.3 miles.

25           THE COURT:  You are saying by roadway?

16

1          MR. GANNON:  Yes.

2          THE COURT:  Is where he was within two miles of

3    the Judge's home?

4          MR. GANNON:  As far as the crow flies?

5          THE COURT:  Yes.

6          MR. GANNON:  Oh, I'm not sure.

7          THE COURT:  Then it's .4 miles?

8          MR. GANNON:  I can't attest -- I'm just asking

9    because the officer answered he wasn't sure if he told

10   Mr. Quisenberry that the exclusion was as the crow flies.

11   That is the purpose of this question.

12          THE COURT:  The Court understands the

13   objection.

14          MR. GANNON:  Your Honor, at this time, I would

15   offer for admission of Defense Exhibit A.

16          MR. LOWRY:  Judge, with my objection noted, I

17   have no objection to it's admittance.

18          THE COURT:  Exhibit A is admitted.

19          (Whereupon, Defendant's Exhibit A was admitted

20   into evidence.)

21   BY MR. GANNON:

22      Q.    Officer, you said there were other exclusion zones

23   added after Mr. Quisenberry was released a second time?

24      A.    It's just places where the victim may be.

25      Q.    And you didn't tell him about these exclusion

1  zones; correct?

2      A.    No.   And, I mean, I wouldn't -- that's a different

3  situation.   He would have -- he would really have no reason,

4  I don't believe, to be in those exclusion zones.   So it's

5  something that strategically I wouldn't tell a defendant in

6  that case.

7      Q.    Would you issue a warrant for him being in that

8  exclusion zone?

9           THE COURT:   Excuse me.   What's the relevance of

10  that, Mr. Gannon?

11           MR. GANNON:   Well, Judge, it goes to the

12  instruction.   Part of the bail, under the rules of that, he

13  has to be instructed specifically on what he is allowed and

14  not allowed to do when there is nonmonetary conditions.

15           THE COURT:   Whether or not he violated any of

16  these other zones is really not at issue in today's hearing.

17           MR. GANNON:   I will move on, Judge.

18  BY MR. GANNON:

19      Q.    Officer, with the restricted zone in question

20  today, did you give him any written instructions?

21      A.    Yeah.   I mean, he has several in regards to what

22  he can and can't do, signed through his house arrest system.

23      Q.    Specifically to the restrictive zone?

24      A.    Well, it says, "exclusion zones."   I mean, you can

25  take a look at it, if you want.   I mean, it's got -- in his

18

1    participant agreement, it clearly says about failure to

2    comply, tracking and maintenance, his curfew, exclusion

3    zones, "I will not travel to any prohibited locations listed

4    in my conditions of release from court order.  I understand

5    that travel into such locations constitutes a violation of

6    the program and will be reported to my officer."

7              I mean, obviously, you know, these types of cases

8    are a little more extreme.

9         Q.    What locations were listed?

10        A.    Well, I specifically told him about Southpointe.

11        Q.    Were any listed?

12        A.    We don't list them.  I mean, we go over that with

13   the individual.

14        Q.    But the instruction says, "the exclusion zones

15   that are listed".

16        A.    Well, I guess what you're saying is there.  We go

17   over that, though, with them.

18        Q.    And you said, "Don't go into Southpointe;"

19   correct?

20        A.    Yeah.  He and I talked.  Southpointe is going to

21   be a violation just because of the distance.

22        Q.    But the only evidence you have is that he drove

23   past the exit; correct?

24        A.    Well, he drove onto the exit.

25        Q.    He drove onto the exit?

1      A.     Yes.

2      Q.     You made the decision to issue the warrant?

3      A.     I did.

4      Q.     Did anyone call you to inform you that a breach

5  was made?

6      A.     Well, yeah.  Our staff was in contact with us.  I

7  confirmed with my assistant chief.  You know, we talked

8  about, you know, potential threats.  You know, the case in

9  general.

10     Q.     Who contacted you from your staff?

11            MR. LOWRY:  Judge, I'm going to object as to

12  relevance.  I don't know if --

13            THE COURT:  Where are we going with this,

14  Mr. Gannon?

15            MR. GANNON:  Well, Judge, I think it's

16  absolutely relevant because what I'm getting at is we can

17  present evidence that Mr. Quisenberry received a call asking

18  where he was, and the caller stated that Judge Costanzo

19  wanted a warrant issued for his arrest because her buzzer

20  went off.  And the question is, Judge -- you know, we're

21  talking credibility.  How many other cases would they come

22  arrest somebody on a Saturday night at their house for

23  driving on I-79, a half mile away from the individual's home.

24  So I am going towards credibility.

25            THE COURT:  I am not interested in other cases

20

1   where they may or may not have taken action.  I am interested

2   in this case.  So let's stick to this case.  The objection is

3   sustained.

4   BY MR. GANNON:

5       Q.      Who is in charge of Washington County Adult

6   Probation?

7       A.      I am.

8       Q.      Who is in charge of you?

9       A.      President Judge Emery.

10      Q.      Do you do work for Judge Costanzo?

11      A.      Do I do work for her?

12              MR. LOWRY:  Objection, Your Honor.  Relevance?

13              MR. GANNON:  Judge, it goes --

14              THE COURT:  Are we just fishing here, or are

15   you going someplace, Mr. Gannon?

16              MR. GANNON:  I'm going to credibility, Judge.

17   If he feels that he has to make a decision because somebody

18   has authority over him, it affects his credibility.

19              THE COURT:  As I understand his testimony,

20   there are a number of warrants that are signed -- presigned

21   in the event some violation occurs.  As the President Judge,

22   I'm assuming that that duty falls to Judge Emery.  So are you

23   saying that somehow he singled this case out?  Is that where

24   we are going with this?

25              MR. GANNON:  Yes, Judge.

1          THE COURT:  Well, you can ask him that.

2    BY MR. GANNON:

3        Q.     Do you do work for Judge Costanzo?

4          MR. LOWRY:  Objection, Your Honor.

5          THE COURT:  Objection sustained.  He doesn't

6    work -- he works -- she is over him because he is the Chief

7    Adult Probation Officer, and she is the President Judge.

8    Whether it be her or some other person, it would be the

9    person in charge, is that correct, whoever the President

10   Judge is?

11         THE WITNESS:  Correct.  I work for the

12   President Judge of the 27th Judicial District of Washington

13   County.

14         MR. GANNON:  I have no further questions,

15   Judge.

16         MR. LOWRY:  Judge, may I approach?

17         THE COURT:  You may approach.

18         MR. LOWRY:  Thank you.

19                 REDIRECT EXAMINATION

20   BY MR. LOWRY:

21       Q.     And I have grabbed what you have previously

22   testified to as the maps that you used to determine an

23   approximate distance between where the defendant was driving

24   and where the victim's house was; is that correct?

25       A.     Correct.

22

1      Q.      And when did you pull these maps?

2      A.      I pulled -- those maps were pulled down on Monday.

3      Q.      And based on these maps, you came to the reasoning

4  or distance-wise that there was .4 miles between where the

5  defendant was on August 10th and the victim's home; is that

6  correct?

7      A.      An estimation in a straight line.  Yes.

8              MR. LOWRY:  Judge, I would just mark these maps

9  as collectively Commonwealth's Exhibit I believe we are A,

10 and move them into admission, Your Honor.

11             MR. GANNON:  I have no objection.

12             THE COURT:  I believe yours was marked Exhibit

13 A.

14             MR. GANNON:  Yes.  I marked A.

15             MR. LOWRY:  Okay.  It's Exhibit 1, Your Honor.

16             THE COURT:  Commonwealth's Exhibit 1 is

17 admitted.

18             (Whereupon, Commonwealth's Exhibit 1 was marked

19 and admitted into evidence.)

20             MR. LOWRY:  No further questions, Your Honor.

21             THE COURT:  Thank you.  You may step down.

22             THE WITNESS:  Thank you.

23             THE COURT:  Anything further from the

24 Commonwealth, or are you resting?

25             MR. LOWRY:  I rest, Your Honor.

23

1        MR. GANNON:  Your Honor, I would call James

2   Quisenberry.

3        (James Carlo Quisenberry, having been sworn,

4   testified as follows:)

5                    DIRECT EXAMINATION

6   BY MR. GANNON:

7        Q.    Mr. Gannon, can you state your name for the

8   record?

9        A.    James Carlo Quisenberry.

10       Q.    What is your current address?

11       A.    My current address is 119 Cider Lane, McMurray,

12   PA.

13       Q.    Do you have any children?

14       A.    Yes, two children.

15       Q.    And are they to an ex-wife?

16       A.    Yes.

17       Q.    Where does your ex-wife live at?

18       A.    713 Centenial Avenue in Sewickley, PA.

19            MR. LOWRY:  Judge, I am just going to object.

20   If the question -- I would stipulate to his children, his

21   wife -- because that all was established at the last hearing.

22   I don't know if this is going to anything else.  I was just

23   trying to --

24            MR. GANNON:  It's just going to his travels

25   that day, Judge.  That's all.  I am not getting into his

1   whole background, because that was obviously presumed.

2   BY MR. GANNON:

3       Q.      You heard the testimony of Officer Ridge; correct?

4       A.      Yes.

5       Q.      How were you instructed regarding the restrictive

6   zones on the Buddi Clip?

7       A.      That was a very loose conversation we had.   In

8   fact, he made a specific comment that he made adjustments to

9   the zone that I could use the Southpointe exits.   And while

10  we did discuss, the Southpointe pool was still up for

11  discussion.   It was never specifically outside the zone.   He

12  made the comments that it was several miles to drive to her

13  house from that point on the map, if you will.   But he made

14  it quite clear that Southpointe exit was available for me to

15  use because I was employed at the time.   You know, I had work

16  in West Virginia, several cities in West Virginia from

17  Morgantown south as well as up to Weirton and the north.   I

18  worked in Washington, PA for that matter.

19          And, obviously, my children co-reside with their

20  ex -- or my ex-wife, their mother, up in Sewickley.   So he

21  made sure that I could use that Southpointe highway exit.

22  Not Southpointe, itself, like, the neighborhoods in

23  Southpointe.

24          Southpointe itself is a gigantic community with

25  residences, commercial operations, as well as, like,

25

1    restaurants and things of that nature as well.

2        Q.     Before your bond was revoked initially, did you

3    have the Buddi Clip on?

4        A.     Yes, I did.  Yes.

5        Q.     Did you use the Southpointe exit during that time?

6        A.     Every day.

7        Q.     Did you have any issues?

8        A.     Not once.

9        Q.     Were you ever alerted to any issues?

10       A.     Not once.

11       Q.     On Friday or Saturday, August 10th, can you

12   explain to me what you did that day?

13       A.     Is August 10th Saturday?

14       Q.     Yeah.  I believe it is.

15       A.     Saturday I got up and took my children -- well,

16   Saturday evening, I guess it was, Saturday night.  I had the

17   children all day, and I took them up to their mother's house

18   in Sewickley.  So around 7:00, I want to say, or a little

19   before 7:00, we went to their mother's house in Sewickley.

20   You know, drove up 79, as I've done numerous times, including

21   the Friday before the Saturday in question.  I took my child

22   to a dentist appointment Friday morning, same routes through

23   Southpointe exit to and from.  Not one phone call regarding

24   the Buddi Clip, not one arrest or anything.  So I had no

25   issues whatsoever on Friday until Saturday evening for some

26

1    reason.   I was coming back through Sewickley -- through

2    Southpointe exit, not through Southpointe itself.   And the

3    Southpointe exit is different than Southpointe.   They are not

4    the same thing.

5         Q.     Did you ever enter into Southpointe?

6         A.     Never.

7         Q.     What happened Saturday night?

8         A.     Well, after I got off the exit, and as I always

9    have, since prior to my bond being revoked and reinstated, I

10   turned left and headed directly towards home.   About, I don't

11   know, three minutes from my house, I guess, I got a phone

12   call from what turned out to be the Washington County

13   Probation Office.   And a young gentleman was asking me, you

14   know, where I was.   And she said, "Judge Costanzo's Buddi

15   Clip had gone off, and she was freaking out wanting to know

16   where I was."

17                  MR. LOWRY:   Objection, Your Honor.   Hearsay.

18                  THE COURT:   Objection sustained.

19   BY MR. GANNON:

20        Q.     Don't tell us what anyone said.

21        A.     Oh, okay.

22        Q.     Just -- you got the call from adult probation?

23        A.     Yeah.   Adult probation -- well, I'm going to say

24   what he said.

25        Q.     What did you do after that?

27

1      A.      Well, he asked me where I was.  I said, "East

2  McMurray Road, and I went home."

3      Q.      After that what happened?

4      A.      Well, then about an hour later, a Peters Township

5  Police Officer showed up at my house and said adult probation

6  had sent him over to check on me and that they had told him I

7  said I wasn't home, which I never did say.

8              And I reiterated that I am not under house arrest,

9  was never advised that I was under house arrest, and I had

10 full reign, just to live my life, and then he said he would

11 like to see my vehicle.

12             I invited him in.  I said, "Please do.  Come on

13 in."  Showed him my vehicle.  He put his hand on the hood.

14 And I said, "It should be nice and hot.  I just got back from

15 Sewickley taking my kids to my ex-wife's home."

16     Q.      Let me stop you.  Were you arrested at that point?

17     A.      No, sir.

18     Q.      When were you arrested?

19     A.      About an hour after that, I'm watching TV at home,

20 doing absolutely nothing, abiding by the bond that -- you

21 know, the bond that the probation statute said I was getting,

22 just watching TV peacefully.  And I got a rap, rap, rap on my

23 door, and three Peters Township Police Officers showed up and

24 said they had just received an arrest warrant that they were

25 asked to execute from the probation office about 9:30 at

28

1  night.

2     Q.    From the time you got home to the time you were

3  arrested, did you ever leave at that point?

4     A.    Never.

5           MR. GANNON:  I have no further questions.

6                    CROSS-EXAMINATION

7  BY MR. LOWRY:

8     Q.    When you were hooked up to the Buddi Clip,

9  probation personnel explained to you restrictive zones;

10  correct?

11     A.    Which time?

12     Q.    The first time.

13     A.    We did.  And we discussed Southpointe was okay --

14  exit was okay.

15     Q.    And when they told you about restrictive zones,

16  you knew that you could not go in to a restrictive zone when

17  you had the Buddi Clip attached to you; correct?

18     A.    Not true.  I was advised I would get a phone call

19  and have to leave if I set off her Buddi Clip.

20     Q.    So you met with them and they talked to you about

21  restrictive zones, right?

22     A.    Yeah.  They said that, "Her Buddi Clip would go

23  off if you came into the zone."

24     Q.    And you knew that the restrictive zone --

25           THE COURT:  Excuse me.  Excuse me.  Could we

29

1    have names instead of they and them?

2    BY MR. LOWRY:

3        Q.      Who did you talk to the first time you were there?

4        A.      Chief.

5        Q.      So Chief Ridge told you about these restrictive

6    zones; correct?

7        A.      No.  He told me about one.

8        Q.      The restrictive zone that you entered; correct?

9        A.      No.  There was not a restrictive zone at that

10   time.

11       Q.      The victim's house was not a restrictive zone at

12   the beginning of the case?

13       A.      No.  The Southpointe exit was available for my

14   use, and that's the only place that I went.  So the answer to

15   your question is no, I did not enter a restrictive zone that

16   I was advised of.

17       Q.      So you heard Chief Ridge testify that he was

18   concerned because you had previously recorded that you have

19   one firearm, when indeed you have four; is that right?

20       A.      I have one at home.

21       Q.      But you have four firearms; correct?

22       A.      Not in my possession.

23       Q.      Do you own four firearms?

24       A.      I do.

25       Q.      And you also -- I believe you actually testified

30

1    when I asked you that you didn't have a prior record, and it

2    is true that you have at least three summary convictions; is

3    that correct?

4         A.    I testified I don't remember it.

5              MR. GANNON:  I will object on two grounds.

6    One, irrelevant.  We are here for only the violation.  And

7    two, a summary conviction -- or a summary offense isn't a

8    criminal conviction.

9              THE WITNESS:  Right.

10             THE COURT:  Well, we are also here to test the

11   credibility of witnesses.  The objection is overruled.

12             MR. LOWRY:  Thank you.

13   BY MR. LOWRY:

14        Q.    So you agree with me then when I asked about your

15   criminal record, you said that you didn't have one, and it

16   turns out that you have three summary convictions; correct?

17        A.    I would imagine there are speeding tickets in

18   there as well that would count as summary, and I don't

19   remember any of them, sir.  My answer to your question then

20   was, "No.  I don't remember that."

21        Q.    And you know that you have three summary

22   convictions; correct?

23        A.    I didn't.  I was not aware of that at the time.

24        Q.    Would you like me to show it to you again, or are

25   you still saying you don't have them?

31

1      A.      I may.  I am asking -- your question was -- if you

2   could reiterate what your question was -- when you asked me

3   before, I did not know that I had three summary offenses.

4      Q.      And then I said, now you know that you have them

5   because I showed you your criminal record.

6      A.      Yeah.  Just three summary offenses.  That's it.

7      Q.      Okay.  So you are not denying that today?

8      A.      Summary offenses.

9      Q.      Okay.

10     A.      Well established.  Yes, sir.

11     Q.      And you also had a different story about what

12  happened at Subway restaurant; correct?

13     A.      No.

14     Q.      Well, you heard the witness testify that you

15  attacked a juvenile at Subway restaurant, and you had a

16  different story; is that correct?

17     A.      No.

18     Q.      You didn't have a different story?

19     A.      My recollection --

20     Q.      So you attacked a juvenile at Subway restaurant?

21     A.      No.  My recollection was she said she wasn't

22  really paying attention because she was making sandwiches.

23  Under --

24     Q.      Is that your -- you can -- is that your testimony?

25  That's your testimony?  I'm asking you a question.

32

1      A.      That's the testimony.

2      Q.      Okay.

3      A.      She said she didn't recollect.  She wasn't paying

4    attention.  She was making sandwiches.  I did not attack

5    anyone.

6      Q.      Can you explain to me why every time it benefits

7    you to have a different story or tell a lie, you do it?

8                   MR. GANNON:  I'm going to object, Your Honor.

9                   THE COURT:  Objection sustained.

10                  MR. LOWRY:  Judge, I have no further questions.

11                  MR. GANNON:  I have no additional questions.

12                  THE COURT:  So your testimony is that in

13   contravention to what the Chief Adult Probation Officer said,

14   you were told by him that you could use the Southpointe exit?

15                  THE WITNESS:  Yes, Your Honor.  I used it many

16   times prior to the Buddi Clip being removed as well as --

17                  THE COURT:  I'm just saying -- I'm just going

18   as to what he told you.

19                  THE WITNESS:  Yes, sir.  Before the Buddi Clip

20   being removed as well as the second Buddi Clip being put on.

21                  THE COURT:  And on the night in question, you

22   were going where?

23                  THE WITNESS:  I just dropped my kids off at

24   their mother's home, and I went straight to my house.

25                  THE COURT:  On Route 7- -- Interstate 79?

33

1      THE WITNESS: That's right. I went up 79 to

2  take them there and came down 79, the same route as I have

3  done a hundred times with the Buddi Clip on, Your Honor.

4  Nowhere near the accuser. Nowhere near. I worked hard to

5  get the bond reinstated. I would never violate your trust in

6  me to get that bond reinstated.

7      THE COURT: So then, if I am going to take what

8  you are telling me, then the Chief Adult Probation Officer is

9  not being truthful when he said -- when he testified under

10 oath that you were told that there was this two-mile zone and

11 you weren't to go into it?

12     THE WITNESS: That's correct, sir. That is

13 correct, Your Honor. He and I spoke specifically about the

14 exit was okay. We discussed, further, the pool with my

15 children and I. And we're trying to figure out -- and our

16 discussion was exactly about a schedule for Judge Costanzo

17 and I -- who could use the pool, because she also belongs to

18 the same pool. So we are trying to see how I could be able

19 to take my kids there and she could take her kids there as

20 well and not be near each other, Your Honor.

21     THE COURT: Well, you heard his testimony that

22 when the pool discussion came up, he told you "any place in

23 Southpointe."

24     THE WITNESS: That is factually inaccurate. We

25 discussed the fact that it was -- for the time being, stay

34

1    away until we can figure it out.  I said, "I can do that for

2    now as long as I can use the highway."

3                    THE COURT:  So he testified falsely on that

4    issue also?

5                    THE WITNESS:  Your Honor, I'm being 100 percent

6    truthful with you as I would never have used --

7                    THE COURT:  I'm not --

8                    THE WITNESS:  I would never have used the exit

9    if I knew that it was not -- if it was in any kind of

10   exclusionary zone, as that's just the common sense exit to

11   take given the routes that I take from my children to go to

12   school up there.  They have activities up there, tutoring up

13   there.  So -- and I have 50 percent custody, so that's the

14   exit I always used and always have used, Your Honor.

15                   THE COURT:  Anything further, Mr. Gannon?

16                   MR. GANNON:  No, Judge.

17                   MR. LOWRY:  Nothing further.

18                   THE COURT:  Thank you.  You may step down.

19                   THE WITNESS:  Thank you, Your Honor.  I

20   appreciate your time.

21                   MR. GANNON:  Your Honor, I have no further

22   witnesses.

23                   THE COURT:  Any rebuttal testimony?

24                   MR. LOWRY:  No, Your Honor.  I have no rebuttal

25   testimony.

35

1          THE COURT:   Do you wish to make argument?

2          MR. LOWRY:   Your Honor, I would just state that

3    consistently throughout this case, the defendant has chosen

4    to fabricate or outright lie or make up facts that perfectly

5    align to his story or perfectly align to him not doing

6    anything wrong or violating any bond conditions or owning

7    four guns when he only said he had one or about his criminal

8    history.

9          It is clear, based on the defendant's

10   interaction at Subway and this violation, that he cannot

11   conform himself to the rules and he can't follow his bond

12   conditions.   The defendant is demonstrating for the Court

13   that he is unable to follow any and all conditions put on

14   him.

15         Now, Judge, you heard the defendant testify

16   that he was taking his children back home to his ex-wife's

17   house.

18         I submit that the defendant could have been

19   testing the Buddi system to see how close he could have got

20   to the Judge's house without being caught.   He was pushing

21   it.   He was testing the system to see.   And when he got

22   caught, he then said, I was taking my children up to his

23   ex-wife's house.

24         Now, I will say that I am requesting for his

25   bond to be revoked at this time.

1        However, I do understand that the Court may

2    view this violation in a different light than the Subway

3    violation.  And if this Court is so inclined as to grant bond

4    to the defendant again, I would ask for a zero tolerance

5    instruction from Your Honor and to instruct the defendant

6    that he is at no times to be anywhere near Southpointe, which

7    includes I-79 or the on-ramp to I-79 or anywhere in that

8    area.

9        That's all I have, Your Honor.

10       THE COURT:  Mr. Gannon?

11       MR. GANNON:  Your Honor, first, with respect to

12   the warrant itself, the fact that there are presigned

13   warrants aren't lawful in and of itself.  The decision to

14   revoke a bond or revoke and release is up to the bail

15   authority, which is a Judge in this case, not the probation

16   office.  He shouldn't have full authority to decide when

17   someone's bond is revoked.

18       It's my understanding that the entire bench in

19   Washington County has recused themselves from this case

20   because they cannot be unbiased, and I believe that includes

21   Judge Emery.  So using a warrant with her signature, in my

22   opinion, by itself is unlawful.

23       And also, Your Honor, the bench warrant itself

24   is now past 72 hours.  We are having this hearing today.  I

25   filed an emergency motion.  The laws state that the

1    conditions -- nonmonetary conditions of a bail bond must be

2    specifically explained on the bail itself.  That wasn't done

3    in this case.  Bail says he has restricted areas that are

4    listed.  They weren't listed.  It wasn't explained to him.

5    Mr. Quisenberry testified he traveled this route previously.

6    There was no testimony to contradict that notion.

7             And, Your Honor, the fact that the Commonwealth

8    relies upon three summary convictions should show what this

9    case is about.  A summary conviction is not counted on their

10   prior record score, will not show up when you bring your

11   prior record through the Pennsylvania State Police.  It's a

12   reach, Judge.  If this case involved anyone other than a

13   victim as a Judge, it wouldn't have been prosecuted this way,

14   he wouldn't have been arrested on a Saturday night.

15            Judge, Chief testified specifically it takes

16   four minutes to walk .2 miles.  That would take --

17   supposedly, according to their evidence, Mr. Quisenberry

18   walked .8 miles to Judge Costanzo's house from where he was.

19            THE COURT:  You mean eight minutes?

20            MR. GANNNON:  Eight minutes.  So they responded

21   approximately three hours later.  So what response time are

22   we talking about?  Obviously, they weren't so concerned he

23   was going to hurt her that they flew there that instance.

24   They wait hours later to approach his house when he's at

25   home.  He never left his home.  He cooperated.

38

1                THE COURT:  What testimony was there they

2  waited hours later?  I thought that someone went to his home,

3  his car was still warm.

4                MR. GANNON:  He wasn't arrested at that point,

5  Judge.

6                THE COURT:  No.  He was not arrested.

7                MR. GANNON:  I'm saying until he was arrested.

8                THE COURT:  He could have been arrested until

9  the warrant was issued.  The warrant came from an unbiassed

10  source, not from Judge Emery.  She presigned all of the

11  warrants.  I directed that the warrant be issued on Saturday

12  night, shortly before 9:00 p.m.

13                MR. GANNON:  Well, I didn't receive a copy of

14  the warrant, Judge.

15                THE COURT:  No.  I didn't sign it.  I was told

16  that there was a presigned warrant by Judge Emery.  The

17  question to me was, "Should it be issued?"  I said, "Did he

18  violate the terms?"  They said that he did, so I directed

19  that the warrant be issued.  So it did come from an unbiased

20  source.

21           I am not biased in any way towards your client.

22  I don't know your client.  I am a visiting judge here.  As I

23  mentioned months ago, when I was assigned this case, I did

24  meet Judge Costanzo on one occasion at the midwinter meeting

25  of the Trial Judges' Association.  I was introduced to her by

39

1    Judge Cordaro, who you know.  I said hello to her.  She said

2    hello to me, and that was basically it.  And I have not seen

3    her since, other than when we have been in court.

4              MR. GANNON:  I am not saying that this Court is

5    biased, Judge.  I am arguing on the testimony that I heard.

6    I didn't hear any testimony that you issued the warrant.  So

7    I was operating under the testimony that it was issued

8    directly from adult probation from a presigned stack.

9              In any event, Judge, the bond conditions still

10   have to be laid out specifically so Mr. Quisenberry knows

11   exactly where he can and can't go.

12             If the Court will release him and he is told he

13   cannot use that Southpointe exit, I can guarantee it he won't

14   use that Southpointe exit.  He doesn't want to be

15   incarcerated away from his children.

16             THE COURT:  Well, his testimony was he was

17   never stopped before for it.  The testimony of the Chief

18   Adult Probation Officer was he was told that there was a

19   two-mile radius from the Judge's home.  And he was within

20   that radius, whether it was the Southpointe exit or any place

21   else, he was told -- if I'm to believe Chief Probation

22   Officer's testimony, Southpointe was a no-no for him in any

23   fashion.

24             MR. GANNON:  And he never traveled directly

25   into Southpointe, Judge.  He used that exit before with no

40

1  problem.

2                THE COURT:  Well, that's his testimony.  And I

3  don't know -- that's the only testimony I have on that issue.

4                MR. GANNON:  And that's why I'm arguing that.

5  If that's incorrect, they can track him on the Buddi Clip.

6  They could present evidence that he never used that exit.

7                But, Judge, the fact is, he -- the allegations

8  in this case -- calls went from August to January of 2019.

9  He wasn't placed on the Buddi Clip until March or April.  So

10  there were two months there where he was unsupervised, and he

11  never tried to contact Judge Costanzo.  He never went to her

12  home.  That wasn't his intent.  If he intended to hurt her,

13  he intended to harass her, he could have done it within those

14  two months, Judge.  So I would say, that goes to show the

15  fact that this wasn't his intention.  He was taking his

16  children home.  He was coming back to his house.

17                THE COURT:  Well, I don't know what his

18  intention was.  But if I am to take your argument that I am

19  to discredit the testimony of the Chief Adult Probation

20  Officer of this county, when he testified under oath that he

21  specifically went over these matters with your client and

22  accept the word of your client -- is that what you are asking

23  me to do?

24                MR. GANNON:  Well, Judge, even if you belive --

25  even if it's true that he went over, he still has to include

41

1    that in the bond conditions given to him.  It has to be

2    specifically laid out according to the law.  It can't be

3    orally given.  It has to be specifically written out in

4    detail, any nonmonetary conditions.  And there was testimony

5    that that wasn't done in this case.

6                    Now, if the Court would grant him release on

7    bond and those things are specifically laid out, I can

8    guarantee you he would follow it to a "T" for the remainder

9    in this case.

10                   But, Judge, I mean, that's, basically -- I

11   believe it's Rule of Criminal Procedure 527.  It must be

12   specific.  The bail authority shall state with specificity on

13   the bail bond any nonmonetary conditions.  And that wasn't on

14   the bail bond itself, Judge.

15                   On that basis, I ask that the motion be denied.

16                   THE COURT:  Does the Commonwealth care to

17   respond?

18                   MR. LOWRY:  Judge, I would just state that the

19   specific locations of the restricted zones were not listed on

20   the bond conditions.  However, they were explained to the

21   defendant in person.  And one of his bond conditions was to

22   comply with the Buddi Clip.  That, in and of itself, in

23   addition to sitting down with the defendant, pointing to a

24   screen and saying, "You cannot enter this red zone" is

25   sufficient notice to the defendant that if he enters that

42

1    zone, that would be considered a violation of his bond.  A

2    warrant would be issued for his arrest, and he would be

3    arrested.  That was explained to the defendant.

4              Now, I understand that the rule says it must be

5    with specificity on the actual bail bond paperwork.

6              However, I think, when you break it down into

7    those specific -- it's impractical.  It doesn't happen on any

8    case.  It's more this is a condition, and then they explain,

9    here is a big, red dot on the screen.  It's two miles around

10   the Judge's house.  You cannot enter.  There is no question

11   that the defendant was on notice that he could not enter that

12   area, and he entered that area.

13             This is, again, the defendant simply throwing

14   himself in the face of the law, disobeying his conditions,

15   and doing what he pleases.  And if even assuming that this

16   Southpointe area was told to the defendant to be off limits,

17   I would argue that it shows Your Honor that the defendant, at

18   the very least, is pushing those limits.  What reasonable

19   person would use the on-ramp at Southpointe to enter onto 79?

20             Defense Counsel said what a major highway 79

21   is, meaning there's tons of on-ramps and exit ramps.  The

22   defendant had numerous choices.  Why place himself, again, in

23   that situation?  It's the exact same argument at the Subway.

24   He cannot conform himself to the rule of law.

25             That would be my argument, Your Honor.

43

1          THE COURT:  I've thought about this case since

2     last Saturday night, and it seems like I have thought about

3     nothing but this case over the last months because all that

4     has gone on in it.

5               Mr. Quisenberry spent nearly two months in jail

6     already, under my order, and now another five or six days.

7     He is probably fast approaching what he would be sentenced to

8     if he just simply pled guilty or gone to trial and been

9     convicted.

10              However, I am quite concerned.  It seems to me,

11    from the two hearings that I had, that Mr. Quisenberry plays

12    fast and loose with the rules that he should be playing by.

13              I am willing to consider, Mr. Gannon, house

14    arrest for your client where he would be restricted to his

15    home, not permitted to leave his home except for employment

16    purposes or hospital or doctors visits.

17              If your client is willing to agree to such, I

18    want you to work something out with the Commonwealth, and I

19    will consider signing a proposed order to that effect.

20              However, I consider him to, at the very least,

21    be a scofflaw with regard to the law and this Commonwealth.

22              In the meantime, the defendant's bond is

23    revoked and he is committed forthwith to the Fayette

24    County -- to the Greene [sic] County Prison.  That order will

25    be handed down in writing.

44

## C E R T I F I C A T E

I hereby certify that the proceedings and evidence are contained fully and accurately in the stenographic notes taken by me of the hearing of the above-cause, and that this is a correct transcript of the same.


/s/ Sara Necciai
Sara Necciai
Court Reporter


The foregoing record of the hearing of the above-cause is hereby directed to be filed.


/s/ Gerald R. Solomon, J.
GERALD R. SOLOMON, JUDGE